# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

VANESSA RACINE,

    Plaintiff,

v.

PHW LAS VEGAS, LLC, and PHW
MANAGER, LLC

    Defendants.

Case No. 2:10-cv-01651-LDG-VCF

**ORDER**

The plaintiff, Vanessa Racine, alleges that she was physically and sexually assaulted by an unidentified man while she was staying at the Planet Hollywood Resort and Casino ("Planet Hollywood").  She brought the instant suit against the defendants, PHW Las Vegas, LLC, and PHW Manager, LLC, ("PHW") as the owners of Planet Hollywood.  Racine brings her claim against PHW pursuant to Nevada Revised Statute 651.015, which establishes a duty for innkeepers to protect their patrons from foreseeable harms.  Racine is additionally alleging that PHW was grossly negligent, and is seeking punitive damages.  Both parties have moved for summary judgment regarding the element of duty under NRS 651.015 (#71 & #75).  Racine additionally seeks summary judgment on all remaining elements of NRS 651.015.  PHW additionally seeks summary judgment as to

Racine's gross negligence claim and her prayer for punitive damages.  For the reasons stated below, the Court will deny Racine's motion, and grant PHW's motion.

Background

As suggested by the evidence in this case, the Planet Hollywood property includes a casino, a mall, a hotel with a lobby and rooms located in what the Court will refer to as the Casino Tower, and a hotel with a lobby and rooms located in what the Court will refer to as the Westgate Tower, and a parking garage.  PHW employs a single security force for the property, but has separate dispatch offices for the Casino Tower and the Westgate Tower.

On June 20, 2010, shortly after 3 a.m., an unidentified man approached Keanna Alamsahebpour and placed his arm around her waist while she was walking in the mall area of Planet Hollywood (#70, ¶ 4).  Alamsahebpour moved away from the man, entered the lobby of the Westgate Tower hotel, and described the man and the incident to someone she believed was a member of the hotel's security staff (#70, ¶ 5).  The Court will refer to this as the Alamsahebpour incident.

Shortly thereafter, an unidentified man followed Susan Lee (who was staying in the same set of adjoining hotel rooms as Alamsahebpour) through the casino and mall.  At about 3:40 a.m., Lee and the man got into a Westgate Tower elevator, and both exited the elevator on the 56th floor.  The man followed Lee to her room.  Lee told the man to leave after he inappropriately touched her, and then entered room 5620.  About five minutes after Lee first entered the room, someone (who had not been invited into the room) grabbed Lee's buttocks from behind, and attempted to push her onto the bed.  He subsequently fled from the room when Lee screamed (#70, ¶ 11, 14; #75, ¶ 31).  The Court will refer to this as the Lee incident.

At about 3:46 a.m., the man who had accompanied Lee onto the elevator to the 56th floor got onto the elevator on the 56th floor, and took that elevator to the lobby.  He then walked and ran through the lobby area.

2

1    At about 3:54 a.m., a call was placed from hotel room 5620 in the Westgate Tower

2    to security in which the caller reported that she and another guest had been sexually

3    assaulted, and requested the presence of a security officer in their hotel room.

4    At about 3:56 a.m., the man who had accompanied Lee onto the elevator to the 56th

5    floor of the Westgate Tower accompanied another, unknown woman down the escalator

6    going from the PHW casino area to the valet area, placing his hand on her back while

7    riding the escalator.  The two then sat down and remained in the valet area.

8    At about 3:58 a.m., Security Officer Scott Koss arrived at room 5620, and took

9    statements from Lee and Alamsahebpour.  Alamsahebpour reported that Lee had arrived

10   at the room 10-15 minutes earlier, and had been followed by and inappropriately touched

11   by a man.  Alamsahebpour further reported that the same man[1] who assaulted Lee had

12   followed and touched her in the mall.  Lee then described her incident with the man to

13   Officer Koss.  At 4:20 a.m., Koss contacted the Las Vegas Metropolitan Police Department

14   (LVMPD) ( #75, Exhibit E).

15   At about 4:03 a.m., the plaintiff, Vanessa Racine, arrived at Planet Hollywood by

16   taxi.  She wandered around the valet parking area for several minutes.  Just prior to 4:10

17   a.m., Racine got onto an elevator in the Casino Tower.  The same man who had

18   accompanied Lee onto the elevator to the 56th floor of the Westgate Tower also got onto

19   the elevator with Racine, placed his hand on her back, then her hair, and appeared to talk

20   with Racine.  The man exited the elevator with Racine.  (#70, ¶ 19-20; #75, ¶ 33).  At about

21   4:35 a.m., the man got onto the elevator in the Casino Tower on the floor of Racine's room,

22   holding a bag.  (#70, ¶ 25; #75, ¶ 31).

23   

24        [1]        While Alamsahebpour acknowledged in her deposition that she had not
     personally seen the man during the time he followed and assaulted Lee, the relevant
25   circumstance is that Alamsahebpour reported to Officer Koss that it was the same man.
     Further, it appears undisputed for purposes of the present motions that the same man
26   assaulted both Alamsahebpour and Lee.

1    Racine did not awake until much later that day.  She subsequently contacted hotel

2  security and the LVMPD and reported that she had been sexually assaulted.  A

3  subsequent examination by the Sexual Assault Nurse Examiner showed the presence of

4  semen on Racine, which semen that did not belong to her boyfriend.  (#70, ¶ 32-34; #75, ¶

5  35).  Racine thereafter brought this action against PHW.

6    Standard of Review

7    In considering a motion for summary judgment, the court performs "the threshold

8  inquiry of determining whether there is the need for a trial—whether, in other words, there

9  are any genuine factual issues that properly can be resolved only by a finder of fact

10  because they may reasonably be resolved in favor of either party." *Anderson v. Liberty

11  Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir.

12  2012).  To succeed on a motion for summary judgment, the moving party must show (1)

13  the lack of a genuine issue of any material fact, and (2) that the court may grant judgment

14  as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

15  (1986); *Arango*, 670 F.3d at 992.

16    A material fact is one required to prove a basic element of a claim.  *Anderson*, 477

17  U.S. at 248.  The failure to show a fact essential to one element, however, "necessarily

18  renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  Additionally, "[t]he mere

19  existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."

20  *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting

21  *Anderson*, 477 U.S. at 252).

22    "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

23  adequate time for discovery and upon motion, against a party who fails to make a showing

24  sufficient to establish the existence of an element essential to that party's case, and on

25  which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  "Of

26  course, a party seeking summary judgment always bears the initial responsibility of

4

1  informing the district court of the basis for its motion, and identifying those portions of 'the

2  pleadings, depositions, answers to interrogatories, and admissions on file, together with the

3  affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

4  fact." *Id.* at 323.  As such, when the non-moving party bears the initial burden of proving,

5  at trial, the claim or defense that the motion for summary judgment places in issue, the

6  moving party can meet its initial burden on summary judgment "by 'showing'—that is,

7  pointing out to the district court—that there is an absence of evidence to support the

8  nonmoving party's case." *Id.* at 325.  Conversely, when the burden of proof at trial rests on

9  the party moving for summary judgment, then in moving for summary judgment the party

10  must establish each element of its case.

11       Once the moving party meets its initial burden on summary judgment, the non-

12  moving party must submit facts showing a genuine issue of material fact. Fed. R. Civ. P.

13  56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir.

14  2000).  As summary judgment allows a court "to isolate and dispose of factually

15  unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the

16  evidence before it "in the light most favorable to the opposing party." *Adickes v. S. H.*

17  *Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however,

18  will not defeat a well-founded motion.  Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v.*

19  *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  That is, the opposing party cannot "'rest

20  upon the mere allegations or denials of [its] pleading' but must instead produce evidence

21  that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of*

22  *Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ.

23  Pro. 56(e)).

24  <u>Cross-Motions for Summary Judgment on Innkeeper Liability</u>

25       To "succeed on a negligence claim for innkeeper liability," a plaintiff must establish

26  four elements: "(1) duty, (2) breach, (3) proximate causation, and (4) damages." *Smith v.*

*Mahoney's Silver Nugget, Inc.*, 265 P.3d 688, 690 (2011) (citing *Doud v. Las Vegas Hilton Corp.*, 109 Nev. 1096 (1993)).  Both parties move for summary judgment as to the duty element.  Racine argues that PHW is civilly liable for her injuries under Nevada Revised Statute 651.015, which states:

> 1.  An owner or keeper of any hotel, inn, motel, motor court, boardinghouse or lodging house is not civilly liable for the death or injury of a patron or other person on the premises caused by another person who is not an employee under the control or supervision of the owner or keeper unless:
>   (a) The wrongful act which caused the death or injury was foreseeable; and
>   (b) There is a preponderance of evidence that the owner or keeper did not exercise due care for the safety of the patron or other person on the premises.
>
> 2.  An owner or keeper of any hotel, inn, motel, motor court, boardinghouse or lodging house is civilly liable for the death or injury of a patron or other person on the premises caused by another person who is not an employee under the control or supervision of the owner or keeper if:
>   (a) The wrongful act which caused the death or injury was foreseeable; and
>   (b) The owner or keeper failed to take reasonable precautions against the foreseeable wrongful act.
>
> The court shall determine as a matter of law whether the wrongful act was foreseeable and whether the owner or keeper had a duty to take reasonable precautions against the foreseeable wrongful act of the person who caused the death or injury.
>
> 3.  For the purposes of this section, a wrongful act is not foreseeable unless:
>   (a) The owner or keeper failed to exercise due care for the safety of the patron or other person on the premises; or
>   (b) Prior incidents of similar wrongful acts occurred on the premises and the owner or keeper had notice or knowledge of those incidents.

As both parties recognize, "[t]he preliminary inquiry in any case involving innkeeper liability is whether '[t]he wrongful act which caused the death or injury was foreseeable,' and thus, whether a duty of care was owed to the plaintiff."  *Smith*, 265 P.3d at 692 (citing NRS 651.015(2)(a)).  The court makes this determination as a matter of law.  *Id.*  Pursuant to NRS 651.015(3), the court "evaluate[s] evidence of '[p]rior incidents of similar wrongful acts' or any other circumstances related to the exercise of 'due care' when imposing a duty under NRS 651.015(2)."  *Id.,* at 692. The "due care" language allows the court "to consider

1   other circumstances regarding the basic minimum precautions that are reasonably

2   expected of an innkeeper." *Id.,* at 691.  As further noted by the Nevada Supreme Court in

3   *Smith*, "[t]he legislative history of NRS 651.015(3)(a) likewise indicates that the

4   circumstances surrounding the commission of a wrongful act may provide the requisite

5   foreseeability for imposing a duty even where no prior incidents of similar wrongful conduct

6   have occurred on the premises."  *Id.*, at 693.

7         For purposes of determining foreseeability, the Court assumes that the same man

8   assaulted Alamsahebpour in the mall and followed Lee through the mall and to her room

9   on the 56th floor of the Westgate Tower at about 3:40 a.m.  He assaulted Lee in her room,

10  and was then recorded getting onto an elevator on the 56th floor at 3:46 a.m.  At 3:56 a.m.,

11  he was recorded descending an escalator to the PHW valet area, in the company of an

12  unidentified woman.  At some time no earlier than 3:58 a.m, Alamsahebpour notified PHW

13  that a man had assaulted both her and Lee.  The man then sexually assaulted Racine in

14  her room after following her onto an elevator in the Casino Tower at about 4:10 a.m.

15        Initially, the Court concludes that Racine has not shown that there were prior

16  incidents of similar wrongful acts that rendered foreseeable the wrongful act against

17  Racine.  As argued by Racine, the attacker's wrongful act, as it concerned Racine, was to

18  follow her into an elevator, follow her off the elevator, and then follow her into her room

19  where he sexually assaulted her.  None of the incidents identified by Racine in her moving

20  papers at pages 16-18 concern an individual following a guest into her room to commit a

21  sexual assault, or concern an individual following a guest into his or her room to commit

22  any act of violence or other wrongful act.  As understood by this Court, the "prior incidents"

23  inquiry under NRS 651.015 requires a determination whether a pattern exists of similar

24  incidents, and whether the incidents establishing this pattern were known to the innkeeper.

25  The knowledge of such a pattern of incidents places the innkeeper on notice of a particular

26  set of circumstances that increase the likelihood of further similar incidents.  This

7

knowledge imposes a duty on the innkeeper to take reasonable precautions to alter those

circumstances so as to protect patrons against the foreseeable wrongful act.  As an

example, a pattern of violent crimes in a particular area of an innkeeper's property (a dark

corner of the garage) would render foreseeable that further violent crimes would occur in

that particular area.  By contrast, and using as an example a prior incident offered by

Racine, a single incident of a battery against a couple taking pictures in the lobby does not

render foreseeable the act of another individual following a guest into a room to commit a

violent crime.  Similarly, an incident of an individual forcing a victim from Las Vegas

Boulevard into the Planet Hollywood garage to commit a violent crime is not similar to the

wrongful act alleged in this case.  The closest Racine comes to identifying prior incidents of

similar wrongful acts is her identification of two separate, apparently unrelated, prior

incidents in which a male approached a female at an unidentified (but apparently public)

location in Planet Hollywood, and reached under the female's dress to insert his finger into

her vagina. Though both incidents involved sexual assaults, the location of each of the

events was in a public area, and the nature of the sexual assault was distinct from the

wrongful act against Racine.  These prior sexual assaults did not inform PHW of a set of

circumstances indicating an increased likelihood of individuals following guests into their

rooms to commit sexual assaults or other violent crimes.  In sum, the prior incidents

identified by Racine did not make foreseeable the attack against her.

In the foregoing determination of foreseeability under NRS 651.015(3)(b), the Court

has not considered the Alamsahebpour and Lee incidents for several reasons.  First,

Racine has not argued that the Alamsahebpour and Lee incidents were "prior incidents of

similar wrongful acts."  Second, as suggested in *Smith,* given that the Alamsahebpour and

Lee incidents occurred immediately prior to the attack on Racine, and given that they

involved the same individual that attacked Racine, it would appear to the Court that they

are appropriately considered as part of the circumstances surrounding the commission of

1  the wrongful act committed against Racine, and thus should be considered under NRS

2  651.015(3)(a).  Third, even if the Alamsahebpour and Lee incidents are considered "prior

3  incidents of similar wrongful acts," under subsection 3(b), the facts of those prior incidents

4  that appear relevant to the Court under 3(b) are the same facts that appear relevant to the

5  Court as circumstances to be considered under subsection 3(a), including the circumstance

6  that all incidents were committed by the same individual within a short period of time.

7  Whether the Court considers the Alamsahebpour and Lee incidents under 3(a) or (b), the

8  Court would apply the same analysis to determine whether, as a matter of law, those

9  incidents rendered the man's subsequent attack on Racine foreseeable to PHW.

10         In considering the circumstances of the Alamsahebpour and Lee incidents to

11  determine whether the assault of Racine was foreseeable to PHW, the Court is mindful that

12  foreseeability is not to be determined with the benefit of hindsight.  Racine's arguments and

13  characterization of the evidence, however, rely upon hindsight.  For example, in presenting

14  her arguments, Racine asserts that security was contacted by room 5620 at 3:54 a.m., and

15  advised that a guest in that room had been sexually assaulted.  She then asserts that "the

16  attacker from room 5620 is seen on the video evidence getting on the elevator from the 56th

17  floor after attacking that guest, and then 'sprinting' out of the elevator."  She further asserts

18  that the attacker is seen on an escalator going toward valet parking at 3:56 a.m., and that

19  this was at a time when PHW "should have been on the lookout for the suspect."  Racine

20  further asserts the "attacker's whereabouts is tracked for the entire time between 3:56 a.m.

21  and the time he attacked Racine," and that this same video footage was at the fingertips of

22  the security department in real time.  She notes that the man "lurk[ed] around the valet

23  parking area . . . (all on video)," after which he followed Racine, and is "seen in an elevator

24  at the same time as her at 4:09:58.  She concludes that this was 16 minutes after security

25  had received the call of a sexual assault from room 5620.

26

1   The Court, however, will not consider the events with the benefit of hindsight.

2   Rather, the Court finds that PHW received a report from Alamsahebpour in the early

3   morning hours of June 20, 2010, in the lobby of the Westgate Tower regarding an incident

4   in the mall.[2]  She "let security[3] in the hotel know at that time there was a strange man in the

5   mall area that had grabbed [her] unsolicited.  And [she] said to keep an eye out for him,

6   because he was very strange.  His behavior was weird."  Alamsahebpour Deposition, p. 18,

7   ll. 14-19.

8   At about 3:54 a.m., a person from room 5620 of the Westgate tower called PHW

9   security and reported that she and another person had been sexually assaulted.  The call

10  was received by Officer Koss of PHW's security, who was working in the dispatch office for

11  the Westgate Tower.  The caller requested the presence of a security officer.  The record

12  lacks any evidence that, during the phone call, PHW received any information indicating

13  where the sexual assaults had taken place, describing when the assaults had taken place,

14  describing the person (or persons) who had committed the assaults, or providing any other

15  information regarding the assaults.[4]

16  At about 3:58 a.m., Officer Koss arrived at room 5620.  As described in Officer

17  Koss's report, he initially spoke with Alamsahebpour who reported that Susan Lee, who

18  _____

19      [2]      Alamsahebpour could not recall when this incident took place, but estimated that it occurred 20 or 30 minutes before the Lee incident.

20      [3]      Alamsahebpour's deposition indicates that she may not have reported the
21  incident to a security officer.  She explained: "I think it was more of, like, there were people there, like, opening doors, and I let one of them know, like some staff of the hotel that was
22  wearing a wire that was standing in the lobby." Alamsahebpour Deposition, p. 19, ll. 2-6. Whether or not she reported the incident to a security officer, the Court assumes that
23  Alamsahebpour reported the incident to PHW, and thus that PHW had notice of this incident.

24      [4]      In her deposition, Alamsahebpour testified that a number of individuals were
25  present (presumably in room 5622) when Lee described what had just happened in room 5620, that it was a "group decision" to call security, but could not recall who made the call
26  to security.  She also could not recall whether a description of the man was made during the phone call.

1  had arrived in the room 10-15 minutes earlier, had been followed and inappropriately

2  touched by a man.  Alamsahebpour then informed Officer Koss that she had seen the

3  same man in the mall,[5] that he had touched her abdomen,[6] and that she had informed the

4  man to not touch her and to get away from her.  The man had then walked past her and

5  through the mall.  Alamsahebpour described the man according to his ethnicity (as she

6  perceived it),[7] and as wearing a grey button-up polo shirt, blue jeans, and having short hair.

7  (#70, ¶ 15-16; #75, ¶ 32).

8         Officer Koss then talked with Lee.  Lee described having been lost in the mall, and

9  that a man had approached her.  She told the man that she was lost.  Lee further informed

10  Officer Koss that the man escorted Lee through the mall, and Lee told the man she was no

11  longer lost.  The man continued to follow her.  She went into a restroom and waited for ten

12  minutes hoping the man would leave.  When she left the restroom, however, he was still

13  waiting for her and followed her onto the elevator in the lobby.  He exited the elevator with

14  her on the 56th floor, and followed her to her room.  The man inappropriately touched her,

15  and Lee told him to stop.  She then entered room 5620, and went into the adjoining room

16  (5622) to the kitchen area to eat.  Lee then informed Koss that when she returned to room

17  5620 (after about 5 minutes), someone grabbed her from behind, and began groping her.

18

19       [5]      Alamsahebpour acknowledged in her deposition that she did not personally
20  see the man who had assaulted Lee, but rather that she had come to the realization that it
    was the same man when Lee described the man following his assault on Lee.  As relevant
21  to the present motion, however, Alamsahebpour reported that she had been assaulted by
    the same man that assaulted Lee.

22       [6]      In her deposition, Alamsahebpour testified that the man had grabbed her
23  around the waist, but otherwise had not touched her in any other inappropriate manner.
    Alamsahebpour Deposition, p. 18, l. 7; p. 23, ll 23-25.

24       [7]      In his report, Officer Koss indicated that Alamsahebpour identified the man as
25  Asian.  In her deposition, Alamsahebpour stated: "he was, like, almost like Asian and
    Hispanic.  I couldn't – he seemed sort of Asian, but he had dark skin.  And he looked like
26  he could be Hispanic or Native American also."  Alamsahebpour Deposition, p. 21, ll. 19-
    22.

11

1  Lee screamed, "causing the [man] to run out the door, and to the elevators."  Lee described

2  the man as having the same perceived ethnicity as described by Alamsahebpour, and

3  wearing a grey shirt and blue jeans.

4          Officer Koss's report does not identify the exact time Alamsahebpour and Lee

5  provided each item of information that he recorded in his report, or when he received their

6  descriptions of the man.  However, Officer Koss's report indicates he had asked Lee if she

7  would like to file a report with the Las Vegas Metropolitan Police Department, that Lee had

8  accepted, and that the LVMPD were notified at approximately 4:20 a.m.

9          An additional fact known to PHW at that time was that it had two video surveillance

10 systems[8] that recorded video images being captured by cameras at various locations

11 throughout the PHW property.  The record lacks evidence as to when PHW first reviewed

12 any of this security video.  The record presented to this Court also lacks any evidence that

13 any of the recordings significant to this action were displayed or seen on a monitor "in real

14 time," i.e., at the time the event recorded was occurring.

15         The video surveillance systems recorded video of the following events, which are

16 significant to the present matter.  These events occurred at the time the recordings were

17 made.  At about 3:46:45 a.m., before any call was made from room 5620 to security, one of

18 PHW's video surveillance systems recorded a man getting onto the elevator on the 56th

19 floor of the Westgate Tower.  Having reviewed the video recordings, the Court notes that

20 this video recording does not reveal the man's actions just prior to the recording.  Nor does

21 the video recording, by itself, allow a determination that the man was a "predator," or an

22 "attacker."  A person viewing the video as it was being recorded would have described the

23 video as depicting a man (not a predator, or an attacker) getting onto an elevator on the

24

25         [8]      The video evidence submitted to the Court reflects that PHW had at least two
   different video surveillance systems, and that the recordings made by one of the systems
26 was of much lower quality than the other.

1  56th floor.  The remainder of the elevator video also lacks any indication of the man's

2  actions prior to getting on the elevator.  The video recorded the man as he pushed the

3  button, as he then stepped back and appeared to check his phone, as he stood in the

4  elevator while it descended, and as he moved forward to the elevator door.

5          The elevator camera also recorded the man walking off the elevator at about

6  3:47:30 a.m.  By 3:47:33, the man left the elevator camera's field of view.[9]  Starting at

7  about 3:47:31, a second camera, one directed at the elevator area of the lobby, also

8  recorded the man walking off the elevator.  This second camera continued to record him as

9  he walked away from the elevator, and roughly toward the camera's location, until about

10  3:47:40.  At that time, the man left the second camera's field of view to the bottom of that

11  view.  Starting at about 3:47:38, a third camera (recording the lobby/concierge desk),

12  captured the man as he entered the field of view from the left, walking and moving

13  diagonally across the screen toward the upper right.  By 3:47:40, the man walked behind

14  one of several pillars blocking the camera's field of view.  The camera recorded the man as

15  he reappeared from behind the pillars at the top of the camera's field of view at about

16  3:47:53, and continued to walk in the camera's field of view.  The man again walked behind

17  other pillars obstructing the camera's field of view at 3:47:57.  At about 3:48:08, the video

18  system recorded the man entering, from the bottom, the field of view of a fourth camera.

19  The camera continued to record him as he walked diagonally across the field of view, away

20  from the camera, toward the upper-right corner of the camera's field of view.  While in the

21  field of view of this fourth camera, the man is recorded as he begins running at about

22  3:48:12.  The camera continued to record the man running until he exited the camera's

23  _____

24          [9]     The plaintiff has represented to the Court that the video surveillance also
   recorded, at 3:40:42 a.m., this same man getting onto the elevator in the lobby of Westgate
25  Tower with Lee, and exiting with her on the 56th floor.  This video was not provided to the
   Court, but the Court assumes for purposes of the motion that the video depicts the scene
26  as described by the plaintiff.

1   field of view at about 3:48:14.   Almost immediately, at about 3:48:15, a fifth camera began

2   recording the man as he entered, in the act of running, at the bottom of the fifth camera's

3   field of view.  That camera continued to record him as he moved away from the camera,

4   toward the top of its field of view.  At about 3:48:20, the camera recorded the man as he

5   stopped running and began walking again.  The man continued to walk until out of the

6   camera's field of view at about 3:48:30.

7       Eight minutes later, at about 3:56:33 a.m. (and two minutes before Alamsahebpour

8   and Lee would began describing the man and their incidents to Officer Koss), a different

9   PHW video surveillance system recorded the man from behind as he descended an

10   escalator.  The man entered the camera's field of view from the bottom of its field of view,

11   as he stepped onto the escalator.  As the camera recorded the man descending the

12   escalator, he was moving away from the camera's position.  The camera also recorded a

13   woman who appeared to be accompanying the man.  While in the camera's field of view,

14   and while on the escalator, the man placed his hand on the woman's back, and the man

15   and woman appeared to act as if they already know each other.  This camera continued to

16   record the man and woman until about 3:57, when they exited the escalator.  A camera

17   with a field of view directed towards the bottom of the escalator recorded the man and

18   woman exit the escalator at about 3:57, and promptly leave the field of view.  A third

19   camera, with a field of view covering the valet area, shows these two persons entering the

20   valet area (apparently from the area at the bottom of the escalator), walk across the valet

21   area, and then appear to sit down together.  As best as the Court can tell, given the low

22   quality of the video, the two remained sitting together until the video submitted into

23   evidence ends at just before 4:06 a.m.

24       In the seconds just prior to 4:10 a.m., PHW's video surveillance system recorded the

25   man getting onto an elevator with the plaintiff.  A camera on that elevator also recorded the

26   man getting onto the elevator with Racine, and then exiting the elevator with her.

14

1    Racine argues that PHW was on "actual notice" that there was a predator on their

2  property, had a description of the predator, and had recorded camera coverage of the

3  areas where the attacker was located.  She further provides the following characterizations

4  of events and evidence: "the attacker from room 5620 is seen on the video evidence

5  getting onto the elevator," "the attacker is seen on the Planet Hollywood Casino escalator,"

6  "the attacker's whereabouts is tracked for the entire time between 3:56 a.m. and the time

7  he attacked Plaintiff Racine."  The argument, and characterization of the evidence, appears

8  to recognize that the critical circumstance in determining whether the man's attack against

9  Racine was foreseeable was whether PHW knew, or should have known, that the man who

10  descended the escalator to valet parking at 3:56:30, and who then remained in valet

11  parking until just prior to 4:10 a.m., was either "an attacker" or "the attacker."

12    The Court does not disagree that the man who grabbed Alamsahebpour's waist, and

13  who attacked Lee in her room, can be labeled as an attacker.  The reports given by

14  Alamsahebpour and Lee would establish, at the time the reports were given, that each was

15  attacked by a man, an "attacker."  Further, that the same man was involved in both

16  incidents indicates an increased likelihood that the man would engage in further

17  inappropriate conduct against woman.

18    That the man can be described as an attacker by those aware of his acts against

19  Alamsahebpour and Lee does not, however, establish that the man would be recognized,

20  or "seen," or "tracked" as an attacker by someone unaware of the man's prior conduct.

21  The only conduct of the man recorded on video that Racine suggests is indicative of the

22  man's attack on Lee is that he broke into a run in the lobby.  The video also shows that he

23  maintained the run only briefly, and then returned to a walk.  The Court cannot agree that a

24  person observing the Westgate lobby at 3:48 a.m., (a time prior even to the call first

25  reporting generally the Lee incident) would have recognized the man as "an attacker"

26  because he briefly broke into a run.  A person observing the Westgate Tower elevator at

3:46 a.m. would not have recognized that the man getting on the elevator on the 56th floor, and pushing a button for the lobby, was "an attacker."  A person observing the escalator descending from the PHW casino to the valet area at 3:56 a.m., in the company of a woman that the man appeared to know, would not have recognized the man as "an attacker."  Further, while the call had already been made at 3:54 a.m. from room 5620 to security that reported a sexual assault had occurred, an observer with knowledge of that call would not have recognized the man descending the escalator as "the attacker."  The man's conduct, as recorded in the video, does not identify him as either "an attacker" or "the attacker."

        While Racine argues that  "the attacker's whereabouts is tracked for the entire time between 3:56 a.m. and the time he attacked Plaintiff Racine," the record does not support this characterization.  Racine's argument concerns the three recordings made starting at 3:56:30 a.m. of the man descending the escalator, exiting the escalator and entering valet, and of the valet area.  PHW did not receive a description of the man, a description that would allow a person aware of the description to identify the man as "the attacker," until some time between 3:58 a.m. and 4:20 a.m.  Officer Koss's report does not indicate when he received Alamsahebpour's and Lee's descriptions, though his report suggests it was after 3:58 (when he first arrived in room 5620) and before 4:20 a.m. (when LVMPD were notified).  The only other witness to the timing as to when PHW received the descriptions was Alamsahebpour.  In response to a leading question suggesting the description occurred at the beginning of her interactions with security, she testified that she didn't remember the sequence of events once security arrived at the room, but "[felt] that the description of him was probably first."  Alamsahebpour Deposition, p. 42, ll 2-7.[10]  However,

---

[10]        Alamsahebpour's lack of recall of specifics of the visit is further exemplified by her initial testimony that she was not shown a photograph of the man at some point in time while PHW security was in the room.  Racine's counsel attempted to refresh Alamsahebpour's memory by showing her the written statement she made for LVMPD, in

even assuming Alamsahebpour and Lee both described the man to PHW immediately after

Officer Koss arrived at room 5620, that description would not have been available to a

person observing the escalator at 3:56 a.m., or the exit of the escalator and the entrance of

valet parking at 3:57 a.m.  Further, a person who began observing the images then being

recorded by the valet area camera at 3:58 a.m., (ie, the earliest any person observing that

recording would have had a description of the man) would not have "seen" or "tracked"

either the described man or "the attacker.  By 3:58 a.m., the man had already entered the

valet area and moved to a location where he appears to sit down.  As a result of the quality

of the video recording, the camera's location, and the location where the man sat down,

even the most careful review of the video that was recorded at 3:58 a.m. does not permit

the conclusion that the man, "the attacker," was then in the valet area.  The same is true of

the remaining video of the valet area submitted to the Court.  Thus, while it is true that the

man's presence in valet can now be "tracked" from 3:58 through at least 4:06 a.m., such

"tracking" is only possible with the benefit of hindsight.  The video evidence submitted to

the Court requires a conclusion that a person who began observing the recording being

made by the valet camera immediately after learning the man's description (ie, no earlier

than 3:58 a.m.) would not have been able to recognize that "the attacker" was in that

camera's field of view.

Thus, while Racine suggests the man was seen and tracked after attacking Lee, the

evidence establishes only that PHW possessed recordings made by its video surveillance

systems from which some of the man's movements, and his location at certain times, can

be reconstructed.  PHW's possession of the recordings made by its surveillance systems

which Alamsahebpour stated that "[t]he man at security showed me their picture, looked
exactly the same as the man I encountered in the mall."  Despite this attempt to refresh
Alamsahebpour's memory, she conceded: "Honestly, I don't remember seeing a picture,
but if I said it, I'm sure that I did."

17

1    during the time period between the Lee incident and the attack on Racine did not render

2    foreseeable the attack against Racine.

3            Racine also argues that the video surveillance recordings were not immediately

4    reviewed.  In light of her other arguments, she appears to be arguing that even if PHW did

5    not actually know the man remained on the property, it should have known that he

6    remained on the property.  Racine has not shown, however, that a meaningful review of the

7    surveillance recordings could have started early enough such that a reasonable review

8    would have disclosed (before 4:10 a.m.) that the man was still present on PHW's property.

9    Officer Koss did not begin to obtain information allowing a meaningful review of the video

10   evidence from Alamsahebpour and Lee until after 3:58 a.m.  Further, even when construed

11   in the light most favorable to Racine, the evidence suggests that, in reviewing the video,

12   the first video in which the man could have been readily identified would have been the

13   video recording of the man getting onto the elevator on the 56th floor of the Westgate

14   Tower at 3:46:45 a.m.  That this video could have been quickly recognized as a likely

15   recording of the man who had attacked Lee would have been suggested (though not

16   established) by the circumstances of its time and location, which would have been

17   consistent with the reports Officer Koss received of the attack against Lee.  Racine,

18   however, offers no evidence as to the minimum amount of time that would have been

19   necessary to identify the video recording of the man getting onto the elevator at 3:46:45 as

20   a recording of the man who had assaulted Lee.  Further, the timing of the video would have

21   revealed that PHW was attempting to locate a man who had left the location of the attack

22   at least twelve minutes prior to PHW getting a description of that man.

23           Reviewing the video recordings to confirm that the man seen at 3:46:45 a.m. was

24   the man who had attacked Lee, for example, by identifying and reviewing the 3:40 a.m.

25   video of Lee and the man ascending in the elevator to the 56th floor together, would have

26

1    required additional time.  However, Racine offers no evidence, or argument, of the

2    necessary, and minimum, additional time required to accomplish this confirmation.

3        Racine has shown that PHW's video surveillance systems would have allowed PHW

4    to reconstruct the man's movements (and thus location) from 3:46:43 a.m. until about

5    3:48:35 a.m., as the man moved through five adjacent areas, each area being recorded by

6    a different camera.  This reconstruction of the man's movement (by tracking him from one

7    location to the next) would have further indicated, at one point, and for a short period of

8    time, he ran away from the Westgate Tower.  As previously noted, however, this

9    reconstruction of the man's movements could not have commenced until after 3:58, and

10   could not have started until someone had first identified the 3:46:45 a.m. elevator recording

11   as having captured images of the man who attacked Lee.  Racine offers no evidence as to

12   the necessary, and minimum, amount of additional time that would be required for a review

13   of the video surveillance that would have only established (a) the man's location at 3:48:35

14   a.m., and (b) that the man was leaving that location at 3:48:35 a.m.

15       Further, even assuming the reconstruction of the man's 3:46:45 through 3:48:35

16   a.m. movements could have been completed prior to 4:10 a.m., the additional information

17   resulting from this review of the video evidence would not have rendered foreseeable the

18   attack on Racine.  The additional information revealed in these video recordings did not

19   indicate that the man decided to remain on the property after his attack on Lee had been

20   ended by her screams.  Rather, the additional information would have established only that

21   two minutes after the Lee incident, and ten minutes before PHW started receiving

22   meaningful information regarding the assault and a description of the man, the man was

23   walking and running away from the location of the incident.  While the Court disagrees with

24   Racine that the man's act of running revealed him as an attacker, an observer with

25   knowledge of the attack (ie, an observer after 3:58 a.m.) would have witnessed an act

26   (running away) consistent with a man leaving a location as quickly and entirely as possible.

1   Rather than establishing foreseeability, the reconstruction of the man's movements through

2   3:48:35 a.m. would have suggested the opposite; that it was foreseeable that the man had

3   left the property.

4       More critically, however, starting at 3:48:35 a.m., and continuing until about 3:56:30

5   a.m., PHW's video surveillance systems did not record the man's movements and

6   location.[11]  Further review of the surveillance recordings made subsequent to 4:38:35 do

7   not allow a nearly seamless reconstruction of the man's movement, second-by-second, as

8   he moved away from the Westgate Tower and through adjacent areas of the property.  Any

9   review of video recorded during this time would as likely suggest that the man had left the

10  property, consistent with his last reconstructed movements prior to 4:38:35 a.m.

11      A different PHW surveillance system next recorded the man nearly eight minutes

12  after the last prior recording of the man, when he was descending the escalator at 3:56:30

13  a.m.  Racine does not offer any evidence as to the necessary, and minimum, amount of

14  time that PHW would have required to not only locate that particular recording but to also

15  recognize its significance as a recording of the man.  The Court cannot find the attack

16  against Racine was foreseeable to PHW based solely on evidence that it is now *possible* to

17  establish, from recorded video, that the man remained on the property after the Lee

18  incident.  That PHW's surveillance system recorded the man's location at 3:56:30 a.m.,

19  does not establish that PHW could have identified and recognized the significance of the

20  3:56:30 recording before 4:10 a.m.[12]  Accordingly, the Court finds that, before the man

21  _____

22      [11]     The alternative explanation is that the man's location was recorded during
    this period by some cameras but, despite the time available since the incident, poor video
23  quality or other circumstances have precluded the identification of the man in any other
    video recording during this period.

24      [12]     The Court is further mindful that, in the 3:56:30 video, the man appears in a
    context inconsistent with the context recorded in the 3:46:43 to 3:48:35 sequence.  Rather
25  than depicting an unaccompanied man walking, and sometimes running, through the
    Westgate Tower lobby, the 3:56:30 video depicts a man accompanied by a woman with
26  whom he appears acquainted.  Racine has not offered evidence as to how, prior to 4:10

1  attacked Racine in her room,  PHW did not know, and could not have known, that the man

2  who attacked Lee, and who stopped that attack in response to Lee's screams, and who

3  had run from her room and to the elevator, had not fled the PHW property.

4        In sum, for purposes of determining foreseeability, the wrongful act against Racine

5  was that a man she did not know followed her into her room at about 4:10 a.m., and then

6  sexually assaulted her in her room.  The record lacks evidence of prior incidents of similar

7  wrongful acts.

8        The circumstances of the sexual assault of Racine include Alamsahebpour's report

9  to PHW, sometime before 3:30 a.m., that a man had inappropriately touched her while she

10  was in the mall area.  Alamsahebpour's first oral report to PHW did not make foreseeable

11  the sexual assault of Racine.  At 3:54 a.m., PHW received a call notifying PHW that the

12  female caller and another guest had been sexually assaulted.  The record lacks any

13  evidence that PHW received any further information during the call.  This call did not make

14  foreseeable the sexual assault against Racine.  Beginning at 3:58 a.m., PHW was again

15  notified of the details the Alamsahebpour incident, and was notified in the first instance of

16  the details of the Lee incident.  PHW was also informed that the same man was involved in

17  both incidents, and received Alamsahebpour's and Lee's description of the man.  PHW

18  also learned that the Lee incident had occurred 5 or 10 minutes before PHW received the

19  call reporting the sexual assault of the caller and another guest.  PHW also learned that the

20  Lee incident ended when Lee screamed, and the man ran from the room and to the

21  elevator.  The information received by PHW did not make foreseeable that, following the

22  attack on Lee, the man would remain on PHW's property.  Rather, the information would

23  have indicated an increased likelihood that the man would have quickly left the property

24  _____

25  a.m. and without the benefit of any knowledge gained after 4:10 a.m., PHW could have
   identified the 3:56:30 recording as depicting the man, despite the apparent additional
26  presence of a female companion.

1   entirely.  The information provided to PHW beginning no earlier than 3:58 a.m. did not

2   make foreseeable the sexual assault against Racine.

3        Prior to the assault against Racine, PHW's video surveillance systems recorded

4   various locations of PHW's property.  Some of the recordings depicted the man who had

5   assaulted Alamsahepbour and Lee.  PHW's possession of the recordings from its video

6   surveillance systems that depicted the man did not make foreseeable the sexual assault of

7   Racine.

8        The record suggests it is extremely unlikely that PHW could have commenced a

9   meaningful review of its video surveillance recordings prior to the sexual assault against

10  Racine.  Further, even assuming a meaningful review of PHW's video surveillance

11  recordings could have started prior to 4:10 a.m., the record precludes a conclusion that

12  such a review could have disclosed (before 4:10 a.m.) that the man had not left the PHW

13  property after his assault on Lee.  Rather, the first video recordings likely to have been

14  reviewed would have depicted the man leaving the location of the sexual assault against

15  Lee by both walking and running.  This video evidence, even if its significance could have

16  been ascertained prior to 4:10 a.m., would not have rendered foreseeable the sexual

17  assault against Racine.  (Rather, this video sequence would have suggested the man was

18  in the process of leaving the property at 3:48 a.m., 6 minutes before PHW first received

19  any notification concerning the man's assault of Lee, and at least 10 minutes before PHW

20  received any details of that assault, including a description of the man.)

21       PHW's video surveillance system recorded the man's location starting at 3:56:30

22  a.m.  The record, however, lacks any evidence that such a review of the recordings made

23  by PHW's video surveillance systems that would have resulted in recognizing the

24  significance of the 3:56:30 a.m. recording of the man could have been completed prior to

25  4:10 a.m.  PHW's video surveillance system continued to record the man's presence in the

26  valet area until at least 4:06 a.m.  Due to the circumstances of that recording (poor quality,

location of camera, location of man), the significance of the valet area recording requires

first identifying the significance of the 3:56:30 and the 3:57 video recordings of the man

descending and exiting the escalator to the valet area.  PHW's possession, prior to 4:10

a.m., of these video surveillance recordings does not render foreseeable his wrongful act

against Racine.  Racine has not shown that a meaningful review of PHW's video

surveillance recordings could have resulted in identifying the significance of the 3:56:30

and the 3:57 a.m. recordings prior to 4:10 a.m.

PHW was notified of the details of the assault against Lee, including a description of

her attacker, beginning at 3:58 a.m.  Racine seeks a determination, as a matter of law, that

PHW had a duty to protect her from the attack against her that began twelve minutes later.

At its essence, she seeks a determination as a matter of law that PHW had a duty, to be

completed within twelve minutes, of identifying, locating, and apprehending the man who

had fled from room 5620 eight minutes before PHW first received any notice of the attack

against Lee.  Any such duty, however, arises only if the sexual assault of Racine was

foreseeable (as a matter of law) because of a failure to exercise due care; a failure to

engage "in the basic minimum precautions that are reasonably expected of an innkeeper."

*Smith*, 265 P.3d at 691.  This determination is made in the context of the totality of the

circumstances.  As relevant to a determination of whether the sexual assault of Racine was

foreseeable to PHW, those circumstances occurred during the sixteen minutes between

the first call and the attack of Racine, and more critically, during the twelve minutes after

PHW first received a description of the man, and the sexual assault of Racine.  The

circumstances that occurred, or that could have occurred, did not and could not have

rendered the sexual assault of Racine foreseeable to PHW.

The Court's conclusion, as a matter of law, that the sexual assault against Racine

was not foreseeable rests upon a consideration of all circumstances (including all

circumstances of both the Alamsahebpour and Lee incidents, and all the video surveillance

23

1   recordings that have been submitted to the Court) both individually and in totality.

2   Therefore, the Court will grant the defendant's motion for summary judgment as to the duty

3   element of NRS 651.015, and will deny the plaintiff's motion for summary judgment.

4

5   <u>Planet Hollywood's Motion for Summary Judgment on Gross Negligence</u>

6        The Ninth Circuit has held that "[w]hat is 'gross' in the particular case is a matter of

7   fact that must be left to the determination of the reasonable persons making up the trier of

8   fact." *Chemical Bank v. Security Pacific Nat. Bank*, 20 F.3d 375 (9th Cir. 1994).  This is

9   particularly true when "witness credibility . . . is clearly at issue, especially in view of the fact

10  that the only evidence submitted is the testimony of the defendant and of experts." *F.D.I.C.*

11  *v. Jackson*, 133 F.3d 694 (9th Cir. 1998) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d

12  497, 507 (9th Cir. 1992)).  Nevertheless, "Rule 56(c) mandates the entry of summary

13  judgment, after adequate time for discovery and upon motion, against a party who fails to

14  make a showing sufficient to establish the existence of an element essential to that party's

15  case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

16  *Catrett*, 477 U.S. 317, 322 (1986).

17       In the instant case, both parties cite to various statements made by their respective

18  security experts to argue that PHW's efforts after learning of the first alleged assault were

19  or were not reasonable.  Ken Braunstein, a security expert retained by Racine, drafted a

20  report dated Dec. 3, 2012, included with Racine's motion for summary judgment, in which

21  he concluded:

22       [PHW] has not trained its' security officers, surveillance personnel or its' other
         personnel, including supervisors, to understand when guests are too
23       intoxicated to protect themselves from harm from others.
         . . .
24       I believe that with proper training and supervision, and an adequate number
         of personnel to protect its guests, the injury to a highly intoxicated female
25       [Racine] . . . would not have occurred.
         (Exhibit M).
26

1   Braunstein thereafter submitted a supplement to his report, dated Apr. 28, 2013,

2   wherein he concluded:

3       It is my further opinion . . . that the failure to have current, professional
        policies and procedures, to properly train and supervise its' security officers
4       to protect its guests, and to not have sufficient security personnel on duty,
        more likely than not, could have prevented the rape of Miss Racine."
5       (Exhibit N).

6       Both parties cite to *Hart v. Kline*, 61 Nev. 96 (1941) for Nevada's definition of gross

7   negligence.  In *Hart*, the Supreme Court of Nevada adopted the definition of the Supreme

8   Court of Vermont, which stated:

9       Gross negligence is substantially and appreciably higher in magnitude and
        more culpable than ordinary negligence.  Gross negligence is equivalent to
10      the failure to exercise even a slight degree of care.  It is materially more want
        of care than constitutes simple inadvertence.  It is an act or omission
11      respecting legal duty of an aggravated character as distinguished from a
        mere failure to exercise ordinary care.  It is very great negligence, or the
12      absence of slight diligence, or the want of even scant care.  It amounts to
        indifference to present legal duty, and to utter forgetfulness of legal
13      obligations so far as other persons may be affected.  It is a heedless and
        palpable violation of legal duty respecting the rights of others.  The element
14      of culpability which characterizes all negligence is, in gross negligence,
        magnified to a higher degree as compared with that present in ordinary
15      negligence.  Gross negligence is manifestly a smaller amount of watchfulness
        and circumspection than the circumstances require of a prudent man.  But it
16      falls short of being such reckless disregard of probable consequences as is
        equivalent to a willful and intentional wrong.  Ordinary and gross negligence
17      differ in degree of inattention, while both differ in kind from willful and
        intentional conduct which is or ought to be known to have a tendency to
18      injure."
        *Id.* at 674.
19
        In the instant case, no reasonable trier of fact would be able to determine that PHW
20
    acted with gross negligence, even if each of the criticisms raised by Braunstein were
21
    believed.  The record, even when viewed in the light most favorable to Racine, establishes
22
    that PHW had security personnel on the premises, who were accessible to receive
23
    complaints from Alamsahebpour and Lee; that these security personnel met with both
24
    women and took statements from them; that PHW security personnel contacted LVMPD;
25
    and that PHW maintained video surveillance of the premises (#70).  Racine has not
26

1   shown that PHW "fail[ed] to exercise even a slight degree of care."  Because no

2   reasonable trier of fact would be able to find that PHW was grossly negligent, the Court

3   will grant PHW's motion for summary judgment as to this claim.

4          Punitive Damages

5          The Nevada Supreme Court has held that punitive damages may be awarded only

6   after "the district court makes a threshold determination that a defendant's conduct is

7   subject to this form of civil punishment."  *Countrywide Home Loans, Inc. v. Thitchener*, 124

8   Nev. 725, 740 (2008).  Thereafter, "the decision to award punitive damages rests entirely

9   within the jury's discretion."  *Id.*  Under NRS 42.005, a plaintiff must demonstrate that a

10  defendant has engaged in malice, oppression, or fraud, in order to seek punitive damages.

11          Under NRS 42.001, which defines each of those terms, malice includes both

12  "express" malice, which is defined as having intent to injure a person, and "implied" malice,

13  which is defined as a "conscious disregard of the rights or safety of others."  Oppression is

14  similarly described as requiring a "conscious disregard" of a persons' rights.  Racine never

15  alleged that Planet Hollywood acted with intent, so accusations of express malice are

16  inapplicable.  Moreover, the Nevada Supreme Court has held that "in defining what

17  conduct would amount to conscious disregard . . . we conclude that NRS 42.001(1)

18  denotes conduct that, at a minimum, must exceed mere recklessness or gross

19  negligence."  *Id.*  As this Court has already discussed, Racine's claims do not rise to the

20  level of gross negligence, so accusations of implied malice or oppression are also

21  inapplicable.

22          Finally, Racine never alleged fraud within her complaint.  Instead, she argues in her

23  opposition that PHW committed fraud by attempting to replace one security report with a

24  second, more detailed report during the discovery period.  If Racine believes such an

25  incident occurred, and amounted to fraud, then Racine must amend her complaint to

26  include sufficient allegations to satisfy the particularity requirements of Rule 9(b).  Without

such allegations, Racine cannot use fraud as the basis of her prayer for punitive damages. The Court accordingly makes a threshold determination that punitive damages will not be available in the instant case, and will therefore grant Planet Hollywood's motion for summary judgment as to this claim.

Therefore, for good cause shown,

THE COURT **ORDERS** that the Defendant's Motion for Summary Judgment (#75) is GRANTED;

THE COURT **ORDERS** that the Plaintiff's Motion for Summary Judgment (#71) is DENIED.

DATED this 2 day of Sept, 2014.

Lloyd D. George
United States District Judge

27